UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| SARANEKA ALEXANDER, § § Plaintiff § § v. § § CITY OF AUSTIN, KYU AN, AND § DANIEL MCCAMERON § § Defendants. § § | CAUSE OF ACTION: 1:22-cv-520 |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff SARANEKA ALEXANDER brings this 42 U.S.C. § 1983 case against the City of Austin, Austin Police Department Officer Kyu An, and Austin Police Department Daniel McCameron for the brutal and excessive force inflicted on her as she was exercising her free speech and assembly rights and demonstrating against police violence.

### I. PARTIES

1. Plaintiff Saraneka Alexander is a resident of Travis County, Texas.

2. Defendant City of Austin is a municipality that operates the Austin Police Department and may be served through its City Clerk at 301 W. 2nd Street, Austin, TX 78701. The City's policymaker for policing matters was former Police Chief Brian Manley at the time of the incident and is currently Chief Joseph Chacon.

3. Defendant Kyu An is an individual that was employed by the City of Austin Police Department at the time of the incident that make the basis of this lawsuit, and he is sued in his personal capacity for compensatory and punitive damages. Upon information and belief, Defendant An is still employed by the City of Austin. He can be served with process at 715 E. 8th

Case 1:22-cv-00520-RP   Document 1   Filed 05/27/22   Page 2 of 16

Street, Austin, Texas, 78701. At all relevant times, Defendant Kyu An was acting under color of law as an officer of the Austin Police Department.

4. Defendant Daniel McCameron is an individual that was employed by the City of Austin Police Department at the time of the incident that make the basis of this lawsuit, and he is sued in his personal capacity for compensatory and punitive damages. Upon information and belief, Defendant McCameron is still employed by the City of Austin. He can be served with process at 715 E. 8th Street, Austin, Texas, 78701. At all relevant times, Defendant McCameron was acting under color of law as an officer of the Austin Police Department.

## II. JURISDICTION AND VENUE

5. This Court has federal question jurisdiction over this 42 U.S.C. § 1983 action pursuant to 28 U.S.C. §§ 1331 and 1343.

6. This Court has general personal jurisdiction over Defendants as they reside and/or work in Travis County, Texas.

7. This Court has specific *in personam* jurisdiction over Defendants because this case arises out of conduct by Defendant that injured Plaintiff Saraneka Alexander, and which occurred in Travis County, Texas, which is within the Western District of Texas.

8. Venue of this cause is proper in the Western District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in Travis County, which is within the Western District of Texas.

## III. FACTS

9. Following the police killings of George Floyd in Minneapolis and Mike Ramos in Austin, demonstrators organized protests against police brutality outside the headquarters of the Austin Police Department on May 30, 2020 and May 31, 2020.

10. Plaintiff Saraneka Alexander attended the demonstration to support the peaceful demonstrations against police violence and racial injustice.

11. During the protest on May 30, 2020, Alexander was one of many protesters demonstrating in front of APD headquarters on the southbound access road and 8th street underpass.

12. At approximately 6:00pm, Alexander was fervently protesting against police violence when APD officers began to fire less lethal rounds into the crowd without any apparent justification.

13. Both APD officers Kyu An and Daniel McCameron fired less lethal rounds at Alexander.

14. APD Officer McCameron fired a less lethal shotgun at Alexander once.

15. APD Officer An fired a less lethal shotgun at Alexander four times.

16. Video evidence shows that Alexander was doing nothing that would justify such immense use of force.

17. Alexander was struck once in the stomach, then, as she turned to walk away, was struck again in the back.

18. Other protesters immediately surrounded Alexander to come to her aid as she fell to the ground.

19. Despite seeing her fall to the ground and knowing they shot her, no APD officer came to help Alexander.

20. For hours after shooting Alexander, numerous officers standing on the APD headquarters' front steps continued to shoot less lethal shotguns often and without apparent justification into the crowd.

21. Numerous officers were standing alongside Officers An and McCameron, but not one interceded to stop them from continuing to fire their less lethal shotguns into the crowd without reason.

22. Upon information and belief, Officers An and McCameron, and APD leadership generally, were substantially motivated by their opposition to the demonstrators' message that police violence must end and that Black Lives Matter.

23. Officers An and McCameron's attacks on Alexander were shocking, unreasonable, and would chill a person of ordinary firmness from continuing to engage in protected speech and assembly.

24. Tragically, Alexander was just one of several people that Officer An shot on May 30 and May 31.

25. Earlier, at 5:10pm, APD officer Kyu An shot Bomani Barton who was backing away from police on I-35 and had done nothing wrong—in the head with a less lethal shotgun.

26. Bomani Barton had done absolutely nothing wrong.

27. APD Officer Kyu An used unreasonable force against Barton.

28. Officer An has since been criminally indicted by a Travis County Grand Jury for aggravated assault by a public servant for his assault on Barton.

29. Worse still, Alexander and Barton were just two of many people APD officers shot on May 30 and May 31.

30. In fact, on May 30, 2020, APD overreacted numerous times and used chilling, excessive force on multiple individuals. Among others, APD's victims included Nicole Underwood, Jason Gallagher, Joe Herrera, Levi Ayala, and Steven Arawn.

31. APD Officer John Siegel used unreasonable force against Underwood and has been indicted for aggravated assault by a public servant.

32. When asked to explain why he shot Underwood, APD Officer Siegel pled the Fifth.

33. APD Officer Nicholas Gebhart used unreasonable force against Ayala and has been indicted for aggravated assault by a public servant.

34. The City has agreed to pay Ayala a settlement of $2,950,000.

35. APD Officers John Siegel, Salvador Gonzalez-Galvan, and Bryan McCulloch used unreasonable force against Gallagher.

36. APD Officer James Morgan used unreasonable force against Herrera.

37. Numerous other officers used unreasonable force on May 30, 2020.

38. Yet APD leadership did nothing to stop APD's continued violence.

39. On the evening of May 30, 2020, Austin Councilmember Greg Casar texted Chief of Police Brian Manley, City Manager Spencer Cronk, Mayor Steve Adler, and other senior officials about the horrific injuries caused by APD officers' use of less lethal shotguns.

40. In fact, Casar specifically told them about the injuries to Ayala and Underwood and begged them to stop APD officers from continuing to shoot innocent protesters.

41. City and APD leadership refused and APD officers continued to shoot less lethal shotguns with abandon on May 31, 2020.

42. One of the many individuals shot on May 31 was Anthony Evans. Evans was hit in the face. Evans was doing nothing wrong before being shot.

43. APD Officer Kyle Felton used unreasonable force against Evans.

44. The City has agreed to pay a settlement to Mr. Evans of $2,000,000.

45. Another of the many individuals APD shot in the head was Justin Howell, a twenty-year-old Black college student who also had done nothing that could possible justify him being shot.

46. APD Officer Jeffrey Teng used unreasonable force against Howell and the City has agreed to pay him a settlement of $8,000,000.

47. Teng also has been indicted for aggravated assault by a public servant.

48. And when given the opportunity to explain why he shot Justin, he pled his Fifth Amendment right not to incriminate himself.

49. As Justin lay on the ground unconscious and bleeding, no police officer came to help him. Protesters rushed to help Howell, who lay bleeding from a serious head wound from being shot in the head with a projectile fired by an APD officer.

50. Incredibly, rather than assist those protesters get Justin emergency medical care, an APD officer shot at them.

51. In particular, APD officer Chance Bretches shot a medic with her hands in the air who was trying to get Justin help.

52. Maredith Drake was a street medic that was walking toward police with a red cross on her chest and her hands above her head when she was shot by APD.

53. Drake posed no danger whatsoever to anyone before Bretches shot her.

54. APD Officer Chance Bretches used unreasonable force against Drake.

55. And when asked directly if he intentionally shot Ms. Drake while she posed no danger to anyone, Officer Bretches invoked his Fifth Amendment right not to incriminate himself.

56. And Bretches pled the Fifth to questions concerning his assaults on another citizen in 2019 and whether he also assaulted Arianna Chavez.

57. Upon information and belief, to date, none of the officers who have intentionally shot kinetic projectiles at or near protesters have been disciplined.

58. Nor has the APD and its policymakers disciplined any of the officers who saw and did not stop officers from using unreasonable or conscience shocking force.

59. And APD's leaders, who could have and should have stopped their subordinate officers' dangerous conduct, have not been counseled or disciplined in any way for permitting this misconduct.

60. This lack of discipline as to senior leaders and Manley himself is all the more shocking as then Chief Manley acknowledged that Anthony Evans, Justin Howell, Levi Ayala, and numerous other individuals were victims of unjustifiable force by APD officers on May 30 and May 31, and that such force was not justified by any facts known to the department or any of the shooting officers.

61. Moreover, then APD Chief of Police, Brian Manley, adopted policies that encouraged, authorized, or tolerated this unreasonable, unnecessary, and brutally excessive force even though Chief Manley had long known of the dangers of firing projectiles into crowds and at defenseless persons, and was actually aware that bean bag rounds fired from shotguns had been unreasonably used multiple times on May 30, 2020 and multiple times again on May 31, 2020. Despite this, and Manley's awareness of the severe injuries caused by them, APD policies – and Manley – authorized their continued use.

62. Chief Manley knew, as any reasonable policymaker would also know, that as a direct consequence of such practices, people like Plaintiff would be injured and victimized, and their constitutional rights violated.

7

63. Moreover, APD had a long-standing policy of paramilitary training – teaching its officers to act as "warriors," and see conflict with members of the public as inevitable as part of an "us vs. them" culture.

64. Officers were trained to be "indifferent to the community," according to a report commissioned by the City.

65. APD's training academy taught cadets – who later became APD officers – to act as if they were at war with the community they were supposed to be protecting. In one incident, an academy instructor told cadets that if "anyone here says they want to be a police officer to 'help people,' I will punch you in the face."

66. Another instructor told cadets to "pick someone out of a crowd, and ask yourself, 'how could I kill that person?'"

67. A report commissioned by the City found that officers were trained to see "the Austin community [as] the enemy."

68. Unsurprisingly, the report further found that "the culture of a police training academy reflects the culture of a department and impacts the mindset and approach to policing." The report concluded that the City must provide "training for handling protests with non-militaristic approaches."

69. As a direct and proximate result, numerous other people suffered severe and devastating injuries as a result of APD's practices and excessive force on May 30, 2020 and May 31, 2020.

70. According to Dell Medical Center's physicians, at least nineteen people required serious medical care for injuries caused by APD's use of less lethal shotguns on May 30, 2020 and May 31, 2020. Seven victims required surgical interventions and four victims retained portions of the "beanbag" shotgun rounds in their bodies/heads.

71. Victims suffered intercranial hemorrhages, depressed skull fractures, depressed frontal bone fracture, fractured jaws, and brain damage.

72. After ignoring the pattern of excessive force that preceded and followed the attack on Cesar for several more days, multiple members of the City Council called for Manley to be removed as APD's Chief of Police.

73. Following the calls to remove him, Chief Manley acknowledged the obvious, the policies at Austin Police Department concerning the use of bean bag shotguns were dangerously flawed and he agreed to change them – a change any reasonable policymaker should have known to have made prior to Plaintiff being shot.

74. No longer would officers be permitted to fire potentially deadly kinetic projectiles from shotguns at people in crowds.

75. Manley, however, did not ban the use of kinetic projectiles in all situations and did not reform the dangerous paramilitary culture of the police academy.

76. Nor did Manley take any steps to discipline, re-train, or terminate any of the officers known to have used excessive force in response to the peaceful May 30 and May 31, 2020 protests.

### IV. CAUSES OF ACTION

#### A. FOURTH AND FOURTEENTH AMENDMENT EXCESSIVE FORCE – AS TO DEFENDANTS KYU AN AND DANIEL MCCAMERON

77. Plaintiff hereby adopts, incorporates, restates, and re-alleges the preceding paragraphs as if alleged herein.

78. APD Officers Kyu An and Daniel McCameron, while acting under color of law, used excessive force on Saraneka Alexander.

79. APD Officers Kyu An and Daniel McCameron's use of force was wholly excessive to any conceivable need, objectively unreasonable in light of clearly established law, and directly caused

Plaintiff Alexander to suffer serious injuries. Therefore, APD Officers Kyu An and Daniel McCameron violated Alexander's clearly established Fourth Amendment right to be free from excessive force and unreasonable seizure.

80. As a direct and proximate result of APD Officers Kyu An and Daniel McCameron's actions, Alexander suffered and continues to suffer significant injuries.

### B.  § 1983 First Amendment Retaliation – as to Defendants Kyu An and Daniel McCameron

81. Plaintiff incorporates the preceding paragraphs as if alleged herein.

82. The First Amendment's protections for free speech and assembly prohibit agents of the government from subjecting an individual, like Alexander, to retaliation for engaging in protected speech rights.

83. Alexander exercised her free speech and assembly rights by attending the demonstration against police violence and brutality across the nation.

84. An and McCameron's actions were an effort to cease Alexander's freedoms of speech and assembly and to instill fear in her.

85. Plaintiff was protesting when she was shot with the projectiles by An and McCameron. An and McCameron did not provide Plaintiff a lawful order, never suspected Plaintiff of committing a crime, never attempted to arrest Plaintiff, and never attempted to render aid after the assault. Plaintiff was never charged with a crime related to the protest.

86. Upon information and belief, An and McCameron's use of force against Alexander was substantially motivated by his disagreement with the content of Alexander's speech. Upon information and belief, An and McCameron shot Alexander with the projectiles substantially because An and McCameron disagreed with Alexander's right to assemble and/or her protected speech.

87. In addition, Alexander was yet one more minority senselessly injured by APD's use of excessive force. Among others, these include Anthony Evans, Levi Ayala, Bomani Barton, and Justin Howell.

### C. Punitive/Exemplary Damages – as to Defendants kyu an and daniel mccameron

88. Plaintiff incorporates the preceding paragraphs as if alleged herein.

89. Defendant's conduct was intentional, wanton, egregious, reckless, and endangered countless community members. Plaintiff seeks punitive damages as well to deter future uses of such excessive force.

### D. qualified immunity under § 1983

90. Plaintiff incorporates the preceding paragraphs as if alleged herein

91. During the protest on May 30, 2020, it is clear that Alexander had the clearly established right to be free from harm, including excessive force in the form of improper use of dangerous projectiles.

92. Officers An and McCameron were carrying out governmental functions in employing the excessive use of force against Plaintiff. Government actors can be entitled to qualified immunity to their individual liability, but this immunity is waived if the complainant shows that:

> a. the individual's acts deprived the party of constitutional rights under color of law;
>
> b. the deprived rights were clearly established and constitutional rights which existed at the time of the acts; and
>
> c. such acts were not objectively reasonable under the circumstances, that is, no reasonable official could have believed at the time that the conduct was lawful.

11

**E.  FIRST, FOURTH, AND FOURTEENTH AMENDMENT § 1983 MONELL CLAIM**

93. Plaintiff incorporates the preceding paragraphs as if alleged herein.

94. APD Officers An and McCameron, while acting under color of law, used excessive and conscience shocking force on Saraneka Alexander when she posed no danger to anyone.

95. This use of force was wholly excessive to any conceivable need, objectively unreasonable in light of clearly established law, and directly caused Plaintiff Alexander to suffer serious injuries. Therefore, Alexander's clearly established right to be free from excessive and conscience shocking force was violated.

96. As a direct and proximate result, Alexander suffered and continues to suffer significant injuries.

97. Likewise, the First Amendment's protections for free speech and assembly prohibit agents of the government from subjecting an individual, like Alexander, to retaliation for engaging in protected speech.

98. Alexander exercised her free speech and assembly rights by attending the demonstration against police violence, and by demonstrating near officers.

99. Upon information and belief, APD Officers An and McCameron's use of force against Alexander was substantially motivated by their disagreement with the content of Alexander's speech. Upon information and belief, the officers shot Alexander with the beanbag shotgun substantially because the officers disagreed with Alexander's right to assemble and/or her protected speech.

100. Moreover, Defendant City of Austin, had the following policies, practices, or customs in place when APD Officers An and McCameron, acting under color of law, injured Plaintiff Alexander and violated her rights under the Constitution:

    a.  Shooting kinetic projectiles into crowds where people could be injured;

    b. Shooting people who posed no danger to anyone with kinetic projectiles;

    c. Using, authorizing, and/or tolerating excessive force against non-violent protestors;

    d. Failing to adequately discipline officers;

    e. Failing to adequately supervise officers;

    f. Failing to adequately train officers concerning de-escalation of force, crowd control, use of force against non-violent protestors, and the use or misuse of kinetic projectiles

    g. Retaliating against protesters;

    h. Failing to train officers regarding demonstrators' free speech and assembly rights;

    i. Not intervening to stop constitutional violations, including but not limited to retaliation, conduct that shocks the conscience, and excessive force;

    j. Training officers to act as paramilitary "warriors," and creating an "us vs. them" culture where officers were "at war" with the community they were supposed to be serving, which encouraged officers to use excessive force; and

    k. Failing to train or instruct officers about specific incidents it considers unreasonable, excessive force, or in violation of the Constitution.

101. Each of the policies, practices, or customs delineated above was actually known, constructively known, and/or ratified by City of Austin and then Chief of Police, Brian Manley (APD's policymaker), and was promulgated with deliberate indifference to Alexander's First, Fourth and Fourteenth Amendment rights under the United States Constitution. Moreover, the known and obvious consequence of these policies, practices, or customs was that Austin Police Department officers would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly

predictable that the particular violations alleged here, all of which were under color of law, would result.

102. Moreover, then Chief Manley was also aware of multiple similar incidents chilling speech and in which unconscionable, excessive, or unreasonable force was used but he did not remedy the misconduct. Thus, the City is also directly liable for Chief Manley's failure to train, supervise, and correct misconduct, which proximately caused Plaintiff to suffer injuries and have her rights violated.

103. Consequently, the policies delineated above were a moving force of Plaintiff's constitutional deprivations and injuries, and proximately caused severe damages.

104. Plaintiff Alexander brings this claim pursuant to 42 U.S.C. § 1983.

## V. DAMAGES

105. Plaintiff Alexander seeks the following damages:

   a. Past and future medical expenses;

   b. Past and future economic damages, including (but not limited to) loss of earning capacity;

   c. Past and future physical pain and mental anguish;

   d. Past and future impairment;

   e. Past and future disfigurement;

   f. Exemplary/Punitive damages as to Defendants An and McCameron; and

   g. Attorneys' fees pursuant to 42 U.S.C. § 1988.

## VI. J&#8203;URY D&#8203;EMAND

106. Plaintiff respectfully demands trial by jury and has tendered the appropriate fee for the same.

## VII. P&#8203;RAYER FOR R&#8203;ELIEF

107. To right this injustice, Plaintiff requests the Court:

   a. Award compensatory damages against the City of Austin, and compensatory and punitive damages against the individual Defendants, including APD Officers An and McCameron;;

   b. Award Plaintiff costs and fees, including but not limited to expert fees and attorneys' fees, pursuant to 42 U.S.C. § 1988;

   c. Award pre-judgment and post-judgment interest at the highest rate allowable under the law;

   d. Costs of court; and

   e. Award and grant such other just relief as the Court deems proper.

Dated: May 27, 2022

>Respectfully submitted,
>Kimbrough Legal, PLLC
>
>*/s/ Tychanika Kimbrough*
>_____
>Tychanika "Tycha" Kimbrough
>Bar No: 24105061
>Email: tycha@kimbroughlegal.com
>Office: 4425 S MoPac Expy, Ste 105
>Austin, TX 78735
>Mailing: P.O. Box 43102
>Austin, TX 78704
>Phone: (833) 553-4251
>Fax: (833) 553-4251
>**ATTORNEY FOR PLAINTIFF**

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**PRISONER PETITIONS**
**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
_____

Brief description of cause:
_____

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $** _____

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [ ] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD
*Tychanika Kimbrough*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____